1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DENNIS FLORER,

                              Plaintiff,

       v.

DEVON SCHRUM, CARLA SCHETTLER,
ALAN WALTER, RICH MOSS, STEVE
SUNDBERG, RON KNIGHT, CHRIS
BOWMAN, STEVE SICLAIRE, STEVE
BARKER, ALAN KUNZ, JOHN
CAMPBELL, WILL PAUL, S. SUKERT,
KURT GRUBB, CANDICE GERMOAU,
JULIE SMITH, SANDY DIIMMEL, AL
MOSLEY, MILES LAWSON, RON
FRAKER, JOHN OYEN, DREW
WALTMAN, GARY PIERCE, MARK
KUCZA, DON HOLLBROOK, GERMAINE
BENSON, LINDA BELANGER, ELDON
VAIL, LAURA WYCKOFF-MEYER,
GUSTAVE MEZA, ALAN ROOKSTOOL,
EDUARDO MICHEL, (FNU) DANIEL,
ERIC JACKSON, and BERNIE WARNER,

                              Defendants.

No. C11-5135 BHS/KLS

**ORDER GRANTING DEFENDANTS'
MOTION FOR PROTECTIVE ORDER**

       Before the Court is Defendant's Motion for Protective Order relating to the production of

a surveillance video.  ECF No. 88.  Plaintiff responded to the motion (ECF No. 91) and

Defendants filed a reply (ECF No. 91).  On June 13, 2012, the Court re-noted the motion and

directed Defendants to provide factually specific evidence of security concerns relating to

production of the video.  ECF No. 96.  On June 28, 2012, Defendants produced the Declaration

of Devon L. Schrum, the Director of Security of the Washington State Department of

ORDER - 1

Corrections (DOC).  ECF No. 98-1.  Based on a thorough review of the foregoing and balance of the record, the Court finds that the motion for protective order should be granted.

## BACKGROUND

Plaintiff Dennis Florer is currently incarcerated at the Monroe Corrections Complex (MCC) in Monroe.  This matter is proceeding on Plaintiff's Amended Complaint. ECF No. 44. Plaintiff is suing several Department of Corrections employees of the Washington Corrections Center (WCC), Clallam Bay Corrections Center (CBCC), and Washington State Penitentiary (WSP) for violation of his due process, First and Eighth Amendment rights, and for retaliation.

Plaintiff alleges that in March of 2011, Defendants transferred him to WSP's gang unit even though they knew of the high level of violence that existed therein and knowing that he would be assaulted.  ECF No. 44, pp. 18-19.  He claims that Defendants made this transfer in retaliation for his "historic filings of about 200 grievances and 7 lawsuits since 2004 against WSP and CBCC prison employees." *Id.*  On March 6, 2011, Plaintiff alleges that he was assaulted by a WSP gang unit inmate while WSP guards Wyckoff-Meyer, Meza, Rookstool, Michel, Daniel, and two John Does failed to prevent the assault.  *Id.*, p. 19.  Plaintiff alleges that the assault took place in front of the unmanned officer's station on the east side of F gang unit and that there was no guard within the east side of the unit either prior to or during the assault. *Id.*

On March 19, 2012, this Court entered an Order granting, in part, Plaintiff's Motion to Compel discovery.  ECF No. 82.  Specifically, the Court ordered Defendants to supplement a number of interrogatory responses and to produce a surveillance video, marked as "DVD Evidence Case No. 211-177, Evidence Locker No. 34." *Id.* at 5, 9.  Defendants now seek a protective order limiting the manner in which the video is to be produced.  They propose that a

ORDER - 2

copy not be given to Plaintiff, but that Plaintiff be allowed only to view the video during his law library access time.

Defendants argue that providing a copy of the video presents two important security concerns. The first is that the plastic disc on which the video is produced can be broken or sharpened into a dangerous cutting or stabbing weapon. The second, and more pressing security concern is that Plaintiff could make and distribute copies of the video or allow other offenders to view the video.

Devon L. Schrum, Director of Security for the Washington State Department of Corrections, states that he is familiar with Plaintiff, Dennis Florer, as Mr. Florer has been a security concern for the DOC. ECF No. 98-1, ¶ 3. Mr. Schrum has reviewed the video in question and is of the opinion that providing Mr. Florer with a copy of the video poses major security concerns for DOC and threatens the secure operation of DOC facilities. *Id.*, ¶ 4. Mr. Schrum states that the threat would be even greater if the DOC were forced to provide a copy to Mr. Florer instead of just screening it for him. First the disc could easily be converted into a dangerous cutting or stabbing weapon. Because of this, inmates housed in Intensive Management Units, like Mr. Florer, are not allowed to possess CDs or DVDs. Of greater concern than the physical disc, is the security threat posed by the release of the video's contents. *Id.*, ¶ 5.

According to Mr. Schrum, one of the most important tools for maintaining the security and orderly operation of prisons is remote electronic surveillance system which are in use in all of DOC's major facilities. DOC's electronic surveillance systems consist of fixed cameras located in various locations in a prison that can be monitored contemporaneously by staff and/or have recording capabilities. Electronic surveillance is an essential element of effective control of

ORDER - 3

a population that is 100 percent criminal in its composition and is accustomed to evading dtectoin and exploiting the absence of authority, monitoring, and accountability. *Id.*, ¶ 6. If it were financially feasible to do so, every area of a prison would be video monitored and recorded 24 hours a day to ensure any act of victimization would be discovered and persons held accountable. Unfortunately, that is not possible under DOC's budget. Since resources are not available to accomplish 10 percent surveillance at all times, it is mission critical that inmates and their cohorts not know the capabilities and the limitations of DOC's surveillance capabilities. *Id.*, ¶ 7.

Not all surveillance cameras in DOC facilities are actively monitored by staff. Some cameras are only monitored by staff and create no recordings. Some cameras are only recorded during specific times of day and not others. Some camera stations (camera housing such as boxes and bubble housings) do not contain cameras at al. Some cameras have poor resolution or can be out of service. Some cameras have very narrow fields of view, while others have wide fields of view. Some of PTZ (pan, tilt, and zoom) which have powerful abilities to capture fine detail at long distances. Some are controlled by the person monitoring the camera. Some pan a wide field automatically. Some cameras are so well hidden, they are not suspected by inmates to be present. On the other hand, rumors abound among inmates that there are cameras where none exist. *Id.*, ¶ 8.

It is a significant advantage to have inmates uncertain as to what is being monitored, what is recorded, and what is in the field of view. Inmates will often use "blind spots" (locations that have infrequent staff presence and no electronic surveillance) to commit acts of violence and purveying contraband. In reconstructing incidents and interviewing inmates, it has been found that incident location is often chosen due to a perceived lack of surveillance. In his expert

ORDER - 4

opinion, Mr. Schrum believes that surveillance, real or imagined, is a powerful deterrent to assaults or other problematic behaviors by inmates.  *Id.*, ¶ 9.  Providing inmates with access to recordings of DOC surveillance videos would allow them to accurately determine which areas are weak or devoid in DOC's ability to capture identities in the aftermath of an incident or crime. Sexual predators could use this information to prey upon weaker inmates.  Inmates could also use this information to commit assaults on other inmates.  *Id.*, ¶ 10.

Prison surveillance cameras provide staff and officials a steady and valuable stream of intelligence information which is used in prison investigations and is often used to support prison infractions and/or criminal prosecutions.  DOC is authorized by statute to create and enforce a comprehensive system of prison discipline which is reflected in Chapter 137-25 WAC and Chapter 137-28 WAC.  Inmates who violate prison rules are subject to a broad array of sanctions, including the loss of good conduct time which increases the amount of time an inmate must stay in prison.  If an inmate or any other person were allowed to get any of DOC's recorded surveillance videotapes, they would get not only the specific intelligence information that was recorded, but also the specific intelligence information of the surveillance and recording capabilities of the surveillance cameras in DOC institutions. *Id.*, ¶ 11.

Because the surveillance video at issue in this case includes fighting between inmates and the subsequent swift staff response, it presents a number of additional concerns.  Inmates viewing this video would be able to deduce information regarding staff response including response times, locations from which staff are responding, the length of time it takes the control booth to open doors into the area, and specific defensive techniques to be used by responding staff as well as the abilities and skills of individual staff.  *Id.*, ¶ 12.  This information would allow inmates to better plan their attacks on each other and/or staff, as it would, for example help

ORDER - 5

them complete an attack before staff respond, know which side of a room would be more advantageous or know who/where to place other inmates as look outs to repel staff attempts to respond.  Additionally, the individual staff members' abilities can be picked apart in a video and are likely to make any staff that appeared weak during the response into targets for inmate violence.  The more times an inmate was able to view such a response, the better prepared he would be to counter it.  *Id.*

Mr. Schrum believes that the foregoing threats to the facility can be managed more effectively if DOC maintains custody of the video and ensures that only Mr. Florer can see it.  If Mr. Florer was provided a copy of the video, the threat to DOC would be greater because Mr. Florer would be able to share the video with other inmates or with people currently outside of DOC custody.  Inmates frequently maintain contact with former inmates on the outside.  Based on Mr. Schrum's expert opinion, it is likely that if Mr. Florer were given possession of the video, it would make its way to the outside where it would be circulated back in to other DOC inmates at other facilities, including the one at which the video was taken.  At a minimum, the video would be carefully watched and deconstructed and the security information outlined above would be disseminated through other means to inmates inside.  *Id.*, ¶ 13.  As Mr. Florer is to be released from custody this Fall, if he was provided an actual copy of the video, it would be his to freely disseminate to others as soon as he is released.  DOC does not give copies of such videos to anyone, inmate or not.  *Id.*

High risk inmates, like Mr. Florer, are transferred frequently to protect DOC facilities and staff.  DOC has only five facilities in the state with the appropriate features for such high-risk inmates.  If Mr. Florer is shown the video, he will know the video recording capabilities and staff response tactics for the Washington State Penitentiary (WSP) where this video was recorded and

ORDER - 6

it is extremely unlikely that the DOC will ever let him in that area again. *Id.*, ¶ 14. Were this information to spread to other inmates, DOC would be severely impacted as it would not be able to place those high-risk inmates at WSP. *Id.*

Plaintiff states that he has already viewed the live surveillance in the sergeant's office at the WSP G Unit in January – April 2010. ECF No. 90, at 4-5. Plaintiff also explains that he is not allowed to possess the surveillance video where he is currently housed in the IMU. If Defendants mail the video to him, it would be shown to him by staff delivering the legal mail, and forwarded to the IMU property guard where it would be kept along with several other DVDs that have been produced to him in other litigation (*e.g., Florer v. Johnson-Bales,* Case No. C06-5561KLS/RJB). He would then be allowed to view the video on the "counselor's computer when needed." ECF No. 90, 3-4.

## DISCUSSION

Fed.R.Civ.P. 26(c)(1) provides that a court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: ... forbidding the disclosure or discovery." Fed.R.Civ.P. 26(c)(1)(A). Rule 26(c) authorizes the court to override the presumptively public disclosure where good cause is shown. *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1103 (9th Cir.1999). To obtain a protective order, the party resisting discovery or seeking limitations must, under Rule 26(c), show good cause for its issuance. Specifically, the moving party must make a clear showing of a particular and specific need for the order. *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.1975). The decision to issue a protective order rests within the sound discretion of the trial court. *Wang v. Hsu*, 919 F.2d 130, 130 (10th Cir.1990).

ORDER - 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Defendants' proposed protective order does not prohibit Plaintiff from viewing the video, it merely prohibits him from possessing the video. The Court finds that Defendants have asserted bona fide security justifications for limiting Plaintiff's access to the surveillance video.

Accordingly, the Court finds that Defendants' motion for protective order (ECF No. 88) is **GRANTED;** the video should be shown to Plaintiff, and only Plaintiff, during his law library access time. If Plaintiff wishes to view the video again, he must notify staff to be given access during his scheduled law library time. Plaintiff will not be given a copy of the video.

The Clerk shall send a copy of this Order to Plaintiff and counsel for Defendant.

**DATED** this  23rd  day of June, 2012.

Karen L. Strombom
United States Magistrate Judge

ORDER - 8